Sterling Edward NEWCOMB, Appellant,

v.

UNITED STATES of America, Appellee.

No. 18791.

United States Court of Appeals Ninth Circuit.

Jan. 24, 1964.

Rehearing Denied March 13, 1964.

**650**

Paul Augustine, Jr., Los Angeles, Cal., for appellant.

Francis C. Whelan, U. S. Atty., Thomas R. Sheridan, Asst. U. S. Atty., Chief, Crim. Section, and Robert H. Filsinger, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before BARNES, HAMLEY and DUNIWAY, Circuit Judges.

BARNES, Circuit Judge.

This is an appeal from a denial of a motion to suppress certain evidence, introduced at a trial wherein appellant and two others were charged with two counts of counterfeiting and three counts of possession of counterfeiting equipment.

Appellant was convicted on five counts, and sentenced to five years imprisonment, to run concurrently as to each count. (18 U.S.C. §§ 471 and 474.) The district court had jurisdiction (18 U.S.C. § 3231), as do we on this appeal (28 U. S.C. §§ 1291 and 1294).

The appellant was convicted and his guilt is not raised on this appeal. The appeal involves but one question: Was the trial judge correct in ruling that there was no unlawful search and seizure of the evidence which was the subject of the motion?

Authorities were notified that appellant and his two codefendants were counterfeiting United States currency (ten dollar bills) at Precision Products Company, 3330 South Atlantic Avenue in Long Beach, California.

The government conceded that the informant "does not have any prior or previous reliability as far as the government is concerned." (Tr. p. 43, ll. 13–15.)

The premises described above (wherein the counterfeiting equipment was located and from which it was taken) were entered by the officers by force and without a search warrant. They did this immediately after the arrest of appellant without a warrant, as he was getting into his automobile in the street in the front of said premises.

 The search was lawful only if it was reasonable in view of the situation then and there existing and incidental to a lawful arrest.[1] The arrest without a warrant was lawful only if there existed probable cause for the belief by the officers that counterfeiting by defendants was going on on the said premises. A secret service officer [2] (and these were) may arrest without a warrant and con-

---

[1] "Search and seizure incident to lawful arrest * * * has long been an integral part of the law-enforcement procedures of the United States." Harris v. United States, 1947, 331 U.S. 145, 150–151, 67 S.Ct. 1098, 1101, 91 L.Ed. 1399; United States v. Rabinowitz, 1950, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653; Abel v. United States, 1960, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668.

[2] United States Secret Service, Treasury Department.

duct a search incidental thereto if he has probable cause within the meaning of the Fourth Amendment and United States Code, Title 18, § 3056.[3]

Did the Treasury Department officers have probable cause for the arrest and accompanying search? They did not, says appellant, (a) because the informant was unknown originally to the officers, and had no previously proven reliability; (b) the subsequent information acquired by the officers subsequent to the "tip" and prior to the arrest were all of "innocent" facts, i. e., as consistent with innocence as with guilt; (c) the government refused to name the informant.

The latter point is the first urged by appellant. We see no relevance in it to the sole matter here under inquiry—was there probable cause? The reluctance of the government to name its informers probably increases each time the known reliability of its previous tip is established. But this subsequent reluctance cannot alter the facts the officers had before them when their determination of reliability and probable cause was made.

3. Title 18 United States Code, § 3056, which authorizes Secret Service agents to arrest, reads in pertinent part:
" * * * the United States Secret Service, Treasury Department, is authorized to * * * detect and arrest any person committing any offense against the laws of the United States relating to coins, obligations, and securities of the United States * * *."

4. "On June 27, 1962, at about 2:00 P.M., Secret Service Agent Kenneth Thompson, met with an unidentified person in a drive-in restaurant. This person hereinafter referred to as the informant, told Agent Thompson that David Harding, William Brining, and appellant were counterfeiting $10 bills at Precision Products Company, 3330 South Atlantic Avenue in Long Beach, and that the operation had been in progress for two to three months. He also stated that Precision Products Company was a business engaged in the sale of doors, window sills, plywood and other construction items.
"The informant described to Agent Thompson the individuals involved, and the types, years, and colors of the vehicles that they were driving; that appellant was driving a 1961 Corvair Monza, bronze

The first ground urged is more substantial, but not controlling. The arresting officer did not act on the bare "tip" alone, but on the tip (accepted as being one from an informant of unknown reliability) plus certain confirming facts. These obviously and admittedly were required to establish the reliability of the information originally secured.

Whether this subsequent information is made up of "innocent" and "lawful" acts is of little consequence. The question is what probative force they have; not individually, but collectively, and as they fit into the jigsaw pattern of the entire picture.

The trial judge here had the following facts in mind, all of which were alleged to have had some small or great influence on the totality of the information in the officers' possession when they came to the conclusion there was probable cause for the arrest of Newcomb.

This information as set forth in the margin is, as stated by the government, not disputed by the appellant.[4]

colored, two-door; that Brining was driving a white 1962 Chevrolet pickup truck, without license plates, and that Harding had a blue 1961 Corvan in addition to several other cars. He also related that two of the people he described had police records.
"The informant stated that Brining was assisting the appellant who was printing the notes; that Brining had a financial interest in the counterfeiting operation.
"Informed of the meeting by Agent Thompson, Agent Darwin Horn, on June 27, 1962, contacted the Carpenter Paper Company in Long Beach, California, and was advised that Precision Products, under the name of the appellant, had purchased a 1,000 sheets of 8½ by 11, No. 20 Lancaster, 100% rag bond paper on May 11, 1963.
"At about 5:30 P.M., of the same day, Secret Service Agents took up surveillance at Precision Products and remained there until 1:30 A.M. Agent Thompson observed a night light shining through a curtain which appeared to emanate from a fluorescent table lamp.
"At about 9:30 P.M. that evening, Agent Thompson, with three other agents, went to an apartment house at 24 Sixth

Thus, the following facts gave *some* corroboration, at the least, to the "tip,"

and consequently to the reliability of the informant:

Place in Long Beach, while two agents remained at the stake out at Precision Products. Agent Thompson observed a Chevrolet pickup truck, without license plates, in the underground garage at that address. The appellant and Brining were seen moving a large cardboard box from the stair well to the pickup truck and a short time later Brining drove the pickup truck away. Agent Thompson testified that he knew the man was Brining because he was so described earlier by the informant who had also advised that the appellant and Harding had an apartment at the Sixth Place address.

"Agent Horn, on the same evening, checked the police records relative to the appellant and Harding. He advised Agent Thompson that appellant had been convicted of robbery and served a five to life sentence; that he had another sentence of six months to 50 years for statutory rape; and that his occupation at the time of arrest by the Long Beach Police Department was lithographer. It was also determined that the records at the Los Angeles County Sheriff's Office showed that Harding had a felony conviction for burglary in 1952.

"On June 28, 1962, Agents Thompson, Horn, Weaver and Sheridan took up surveillance at 8:00 A.M., across from Precision Products at 3330 Atlantic Boulevard (sic). Agents Horn and Thompson posed as salesmen in a nearby car agency, and the two other agents occupied a deserted building located about 50 feet from the front door of Precision Products. Agent Thompson noted that there was a large sliding door and a smaller door in the rear of the Precision Products Building, and one front door. The windows at the rear were 12 feet above the ground, and the front windows were heavily draped. When the agents arrived, the 1961 Corvair Monza was already in a parking lot at the front of the building, just to the north of the entrance door. A check of the license number was made with the Department of Motor Vehicles and it was found to be registered to the appellant. Shortly after surveillance began, the appellant was observed exiting from the front door, walking to the Corvair Monza, removing a small box and going back into the building. The door appeared to be locked and had to be unlocked before the appellant could re-enter.

"At approximately 9:45 A.M., Brining drove up in the Chevrolet pickup, parked the vehicle and went into Precision Prod-

ucts. The door had to be unlocked before Brining could enter.

"Precision Products did not appear open for business from 8:00 A.M. to the time of the arrest later that morning. The only persons observed entering the building or leaving the building were the appellant and Brining. About 20 minutes after Brining arrived, the appellant left the building and walked to a mail box. Shortly thereafter, Agent Thompson went to a nearby telephone to call an assistant United States Attorney to obtain a search warrant. It was agreed that while Agent Thompson was making the call, no action would be taken unless the persons in the building were leaving and not expected to return. Agent Thompson advised the Assistant U.S. Attorney of the plan, and provided him with the known facts in order to obtain a search warrant. He requested that an affidavit for a search warrant be prepared.

"While Agent Thompson was conversing with the United States Attorney's Office, the appellant was arrested by Agent Sheridan as he entered his vehicle in front of Precision Products. Appellant had opened the passenger side of the vehicle and placed something inside and then walked around the car, getting in the driver's side. In accordance with a prearranged plan, Agent Sheridan went around on the driver's side and Agent Weaver proceeded up to the passenger's side; Agent Sheridan then placed the appellant under arrest; and Agent Horn rushed to the rear of the building.

"Immediately after the arrest of appellant, Agent Weaver tried the front door—rattling it. He informed Agent Sheridan that the door was locked and the keys to the building were requested of appellant. Agent Sheridan then shouted, 'He is looking out of the window.' The person inside the building had pulled the drape aside, looked out, quickly replacing the drapes in a closed position. He could observe the arrest of Newcomb, who at that moment was being placed under arrest while seated behind the wheel of his car. Newcomb's hands were raised to his eye level, as Sheridan handcuffed him.

"Agent Weaver then went back to the building and pushed the door open. He entered Precision Products, observed Brining at a desk in the front room and told him he was under arrest. Agent Horn was right behind him having returned from the rear of the building.

"The front office was about 10 by 20 feet, and partitioned off except for a door

(1) The individuals named were conducting some operations at 3330 South Atlantic Avenue, Long Beach, California.

(2) Whatever they were doing was business conducted in an unusual manner.

(a) The doors were kept locked during business hours.

(b) The rear windows were twelve feet above the ground.

(c) The front blinds were kept drawn.

(d) Lights were kept on after ordinary hours, and until 1:30 A.M.

(e) There appeared to be no transactions taking place relating to the announced retail business of selling doors, window sills, plywood, and other construction items.

(3) The accuracy of "two defendants having police records" was established. (a) Defendant Newcomb had two previous felony convictions, one for robbery [5] and one for statutory rape, with a sentence of six months to fifty years. (b) Defendant Harding had a previous felony conviction for burglary.

(4) It was discovered through the police records that defendant Newcomb was a "lithographer."

(5) The informant's information as to the three cars used by defendants— their types, makes, registrations, years and colors (even that one had no license plates) was confirmed by officers' observance thereof.

(6) The observations of the officers at 24 Sixth Place, Long Beach, at 9:30 P.M. disclosed the use by Brining and Newcomb of Brining's Chevrolet pickup truck to move large cardboard boxes from an apartment. At the least this disclosed activity between two of the defendants apart from that usually associated with ordinary daytime business; and, additionally, confirmed the accuracy of some of the informant's statements.

(7) Probably most significant of all, independent investigation disclosed the purchase by Precision Products, through appellant, of 1000 sheets of 8½ by 11, No. 20 Lancaster 100% rag bond paper on May 11, 1963.

(8) This paper was the type used to print bonds and stock certificates and was frequently used by counterfeiters of United States currency, as "the best available stock" for their efforts; in fact a purchase of this type of paper was a generally recognized "red flag" insofar as the investigation of counterfeiting by government secret service agents was concerned.[6]

(9) The date of sale of such 100% rag bond, being forty-nine days prior to

---

that led into the back portion of the building. Agent Weaver entered the rear area of the building where he observed a camera and a printing press. A small room was located at the rear, but the door was either stuck or locked. Agent Weaver testified that he believed someone might be in that room, as he had observed a third person in the vicinity of the building earlier that morning and thought he had entered Precision Products from the rear door. The appellant was brought into the back room and advised the agents that the door sometimes sticks and a knife or screw driver was required to get in. Entry was eventually made to the dark room and the counterfeit currency found there."

5. The sentence imposed for this crime—five years to life—indicates the probability it was for first degree robbery, which in California is one perpetrated by torture (or, more usually) by one armed with a dangerous or deadly weapon. Cal.Penal Code, §§ 211, 211a, 213. This information has some bearing on the actions of the officers immediately after the defendant's arrest.

We need not pass on whether the investigating officers should or should not or could or could not have considered whether any suspect had a propensity toward anti-social behavior.

6. Agent Horn testified: "Well, this type of paper, of course, is a very fine, good type of paper. Has a body to it that will stand up. Not as good as the paper that our currency is produced on, but it will stand up almost as well as any type of paper that is produced in a similar thickness of our currency. In other words, this—if you are going to counterfeit bills, this would probably be the best type of paper to obtain."

Agent Thompson testified: "Well, this is about as close as you can come to

the receipt of the information, confirmed the "three months period" during which the alleged counterfeiting was taking place.

(10) Later in May, appellant had purchased 2500 sheets of 8½ by 11 25% rag bond or ivory paper. This type was "sometimes" used by counterfeiters.

(11) The delivery of 100% or 25% rag bond paper in such quantities was in each instance an unusual delivery to a business supposedly selling doors, window sills, and plywood.

(12) The defendant Newcomb, just prior to his arrest, left the premises, placed a box in his car [7] and prepared to leave in his auto.

The surveilling officers had concluded they had sufficient cause to obtain a search warrant, and search the premises. An officer went to a nearby telephone to ask for it of an Assistant United States Attorney when the remaining officers saw the defendant Newcomb about to leave the premises with the box, large enough to have contained a substantial sum of counterfeit money.

Rather than risk the possible placing of an undetermined amount of counterfeit currency in circulation they arrested defendant Newcomb. One agent went to the locked front door and rattled it, calling to the officer arresting Newcomb to obtain his (Newcomb's) keys to the front door. At that moment someone inside parted the curtains, saw Newcomb's arrest (Newcomb's hands were above his head) and quickly closed the curtains. The officer at the front door then forced it open, arresting Brining inside on suspicion of counterfeiting and searched the premises, discovering the counterfeiting equipment which is the subject of the motion to suppress.

We cannot hold the trial court was in error in concluding that there existed in the minds of the arresting officers probable cause for belief in the reliability of the informant who had told them the defendants were counterfeiting ten dollar bills on the premises; or, that one defendant was about to leave the locality. Having probable cause to rely on the reliability of the informant, the officers had probable cause (a) to seek a warrant of arrest, and (b) to arrest without a warrant where a chance to escape, or to destroy evidence, existed. The officers, in view of the circumstances existing at the time of Newcomb's arrest and the action of his associates, had probable cause to forcefully enter the premises in order to prevent escape and to forestall the destruction of evidence by the defendants other than Newcomb. The search of the immediate premises, then, being incidental to a lawful arrest, was proper and the evidence disclosed and discovered thereby admissible if relevant and material, as it most surely was.[8]

The order of the district court denying the motion to suppress the evidence, and appellant's conviction based thereon, are each affirmed.

---

duplicating the genuine paper that U.S. currency is printed on, which is a hundred percent rag content. It is also a very expensive paper, costing much more than, say, even a 25% rag bond, and its just not commonly used."

The purchase was not, therefore, necessarily an "innocent" act.

7. This box contained "figurines," not counterfeit money, when opened by the officers.

8. "* * * while 'an arrest with or without a warrant must stand upon firmer ground than mere suspicion * * * the arresting officer need not have in hand evidence which would suffice to convict.'" Elkanich v. United States, 9 Cir. 1964, 327 F.2d 417 citing and quoting from Wong Sun v. United States, 371 U.S. 471, 479, 83 S.Ct. 407, 9 L.Ed.2d 441, which also holds: "Probable cause * * * must be measured by the facts of the particular case." (Page 479 of 371 U.S., p. 413 of 83 S.Ct., 9 L.Ed.2d 441.)