**UNITED STATES of America,
Plaintiff,**

v.

**Douglas L. FAILLA, Defendant.**

**Crim. 1971–118.**

United States District Court,
W. D. New York.

May 31, 1972.

C. Donald O'Connor, Acting U. S. Atty., Buffalo, N. Y. (James W. Grable, Buffalo, N. Y., of counsel), for the Government.

David A. Bolm, Buffalo, N. Y., for the defendant.

CURTIN, District Judge.

The defendant has been indicted for manufacturing and possessing a stimulant drug, methylene dioxy amphetamine, in violation of Title 21, United States Code, Sections 331 and 360. Pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure, he has moved to suppress evidence obtained from him incident to his warrantless arrest and thereafter pursuant to two search warrants. After hearing the testimony of the arresting agents and the defendant, as well as the argument of counsel, the court makes the following findings of fact and conclusions of law.

On December 7, 1970 a federal narcotics agent working in the Boston, Massachusetts office of the Bureau of Narcotics and Dangerous Drugs telephoned the Buffalo office and informed Agent Mihok that Alfa Inorganics, Inc., a chemical supply house located in Beverly, Massachusetts, had received an order for three pounds of lithium aluminum hydride, a chemical used in the manufacture of amphetamines,[1] from Dr. Paul Burke, 92 Plymouth Avenue, Buffalo, New York. Since the order was written on stationary with the seal of Canisius College commercially imprinted on it, instead of the apparently customary purchase order form, the suspicions of Alfa Inorganics and the BNDD were aroused, and Agent Mihok was asked to investigate. A visit to the College revealed that Dr. Burke was not known to be associated in any way with the institution and that Canisius had not submitted this particular order. A surveillance of the Plymouth Avenue address and corresponding check of telephone company records disclosed that a Jenny Burke, daughter of Dr. Leslie Fiedler, resided there.

On December 28, 1970, with the cooperation of the United Parcel Service, the BNDD agents attempted a controlled delivery of the package of chemicals at the Plymouth Avenue address, but on this day as well as the next, the effort was unsuccessful because no one appeared to be home. United Parcel, later on the 29th, called the Burke apartment and learned that someone would pick up the package at the United Parcel office either that evening or early the following morning.

With Agent Mihok surveilling the United Parcel office, a man later identified as the defendant appeared the morning of December 30, signed for the package as "P. Burke," and left with it in his Volkswagen bus. At the time, Failla was wearing bell bottom blue jeans, a navy peacoat, a large hat, and long shoulder-length hair, and was unshaven. As he attended to a number of errands to the supermarket, bank, and

---

1. After Agent Teresi learned that the material ordered was Lithium Aluminum Hydride, he satisfied himself by referring to his Agents Manual that this material was a precursor for the manufacture of MDA, an amphetamine and a controlled substance. The defendant argues that a precursor is a chemical essential to the manufacture of a particular material, and that Lithium Aluminum Hydride is not a precursor for MDA or the amphetamines but a reagent only. The defendant defines a reagent as a chemical useful for the manufacture of another material, but not absolutely essential. The defendant also claims that Lithium Aluminum Hydride has a number of legitimate uses. Because the proof offered on these points was inconclusive, the court does not base its decision on these arguments.

so on, the defendant was surveilled by a team of agents. After momentarily losing track of the defendant, they observed his vehicle parked at 563 Hopkins Street, Buffalo and, through a check of motor vehicle records, learned that it was registered to the defendant at this address.

Between 11:30 A.M. on the 30th and 5:30 P.M. on January 1, the time of defendant's arrest, he was the subject of an around-the-clock surveillance. About 1:00 P.M. and again at 3:00 P.M. on the 30th, the defendant was observed carrying gray drums from his vehicle to his Hopkins Street residence. At 5:30 P.M., the defendant travelled to the general area of the University of Buffalo campus and was lost by the surveilling agents. At 9:00 P.M., his vehicle was observed parked near Plymouth Avenue at 512 Porter Avenue. Using field glasses, the agents observed the defendant in the third floor apartment at 512 Porter.

On December 31, 1970, the BNDD arranged for Agent Bush to enter the premises at 563 Hopkins Street under the pretext of looking for an apartment advertised for rent. While there, the defendant's father told Agent Bush that he lived in the house but his son lived on Porter Avenue. He showed Agent Bush the apartment for rent and a basement storage area. He explained to Agent Bush that his son, the defendant, had a Ph.D. in chemistry and used the storage area in connection with that interest. Agent Bush could not see inside the locked storage rooms, but did notice a propane torch on a basement table and, on the first floor, an opened crate marked "Alfa Inorganics, Beverly, Massachusetts." The crate appeared to be the same package earlier picked up by the defendant at United Parcel.

The defendant was observed leaving and returning to the Porter Avenue apartment on a number of occasions during December 31. On one occasion, he drove to a pizzeria, purchased a pizza and returned to the apartment. That evening, New Year's Eve, a number of visitors, including a female believed to be Jenny Burke, arrived at different times during the evening, but all had left by 1:15 A.M.

On January 1 at about 9:30 A.M., agents observed the defendant leave the Porter Avenue apartment and, at 10:-00 A.M., he was observed in the basement of the Hopkins Street house by Agent Teresi, who was walking by on a sidewalk close to the windows. Later the same day, he saw the defendant working with laboratory equipment directly beneath the basement windows, but did not know what the defendant was doing.

Upon making this observation, Agent Teresi, on the advice of the United States Attorney, attempted to telephone two United States Commissioners and a District Judge to obtain a search warrant, but was unable to locate any of these persons at home. At 4:30 P.M., one hour later, he again observed the defendant working in the basement. Unsuccessfully, he again tried to reach the Commissioners and District Judge. At 5:15 P.M., the defendant was observed placing three brown paper bags in his Volkswagen bus parked alongside his father's residence and driving away in the vehicle. The agents followed for one block, but then immediately pulled the defendant's vehicle over and arrested him under the authority of Title 26, United States Code, Section 7607.[2] The three paper bags, containing a white powder, were seized at this time. A field check at the BNDD office in Buffalo, where the

---

2. Section 7607 provides that agents of the BNDD may make arrests without warrants for violations of federal narcotic laws where the agent has "reasonable grounds" to believe that the person to be arrested has committed or is committing such a violation. "Reasonable grounds" is the substantial equivalent of probable cause. See Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327, at fn. 3 (1959); United States v. Bianco, 189 F.2d 716 (3d Cir. 1951); and Sanchez v. United States, 311 F.2d 327 (9th Cir. 1962).

defendant was also brought, indicated the bags contained a controlled amphetamine substance.

That evening, search warrants for the house on Hopkins Street and apartment on Porter Avenue were obtained from a United States Commissioner. The affidavits accompanying the warrant applications recited the surveillance activities and circumstances of the defendant's arrest. On the basis of these affidavits, the Commissioner authorized the warrants to be executed that night.

The principal contention of the defendant at this point is that his arrest was without probable cause and, therefore, the paper bags seized at the time of his arrest and all items seized pursuant to the warrants must be suppressed.

While probable cause, of course, must be measured by the facts of the particular case, see Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441, at 450 (1963), certain principles relative to arrests and searches are generally pertinent. It is basic that an arrest with or without a warrant must stand upon firmer ground than mere suspicion. See Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134, 137 (1959). Accordingly, although the arresting officer may be acting in good faith and although the customary search incident to arrest may produce the suspected contraband, as long as the arrest is based solely and entirely on mere suspicion, the arrest and incidental searches will be improper. In short, officers should search incident to arrest, not arrest incident to a search. See Whitely v. Warden, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971).

The court recognizes that the classic definition of probable cause is easy to recite but, for officers required to reach quick decisions, difficult of application. Probable cause is said to exist where "the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief" that an offense has been or is being committed. See Carroll v. United States, 267 U.S. 132, 161, 45 S.Ct. 280, 288, 69 L.Ed. 543, 555 (1925). Officers are not, however, expected to be legal technicians. As the Supreme Court noted in Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879, 1890 (1949), "In dealing with probable cause . . . we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." To establish probable cause, then, there must be a reasonable ground for belief of guilt, but clearly this is less than evidence required to justify conviction. *Id.*

"A probable cause conclusion may be drawn from the gestalt which a factual situation presents; that is, such a conclusion may be deducted from the separate facts as they interrelate, even though such a conclusion could not be reached if the separate facts were evaluated on an individual basis." United States v. Rubio, 404 F.2d 678, 681 (7th Cir. 1968). This is to say that the suspicions engendered by a reliable informant's tip, a report of criminal activity, or plain police surveillance must ripen into a reasonable judgment that a crime is being committed or has taken place. See Spinelli v. United States, 393 U.S. 410, 418, 89 S.Ct. 584, 21 L.Ed.2d 637, 645 (1969). It follows, then, that in determining whether the government has met its burden of showing probable cause, see United States v. Cleaver, 402 F.2d 148 (9th Cir. 1968), the court must consider all of the circumstances known to the agent at the time of arrest. See United States v. Manning, en banc, 448 F.2d 992 (2d Cir. 1971), cert. denied, 404 U.S. 995, 92 S.Ct. 541, 30 L.Ed.2d 548 (1971), and Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142, 145 (1964).

Inferences drawn by an agent as well as facts known to him may constitute the basis for concluding there is probable cause. But the inferences must be rea-

sonable. "Because many situations which confront officers in the course of executing their duty are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability." See Rodgers v. United States, 267 F.2d 79, 87 (9th Cir. 1959). Indeed the facts known to the agent may be in part little more than observation of a series of apparently innocent and lawful acts. Standing alone, these observations would not be enough but, if they served to corroborate the details of an informant's tip, the innocent acts may take on a crucial probative force in finding probable cause. See Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1958); Newcomb v. United States, 327 F.2d 649 (9th Cir. 1964); United States v. Cleaver, 402 F.2d 148 (9th Cir. 1968); and United States v. Barnett, 407 F.2d 1114 (6th Cir. 1969).

One further general principle, namely the preference for warrants, should be described briefly before turning to an analysis of the merits of this case. "An arrest without a warrant bypasses the safeguards provided by an objective predetermination of probable cause, and substitutes instead the far less reliable procedure of an after-the-event justification for the arrest or search, too likely to be subtly influenced by the familiar shortcomings of hindsight judgment." Beck, supra, at 147, 85 sight judgment." Beck, supra, at 96, 85 S.Ct. at 228, 13 L.Ed.2d at 147. Acting on the basis of warrants is preferred. *Id.* See also United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). Indeed, "the resolution of doubtful or marginal cases in this area [probable cause] should be largely determined by the preference to be accorded to warrants." *Id.* at 109, 85 S.Ct. at 746, 13 L.Ed.2d at 689. The strict enforcement of the probable cause requirement, see Henry v. United States, 361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134,

138–39 (1959), is meant to protect both the officer, in his difficult and hazardous work, and the private citizen.

Initially, in discussing the facts here, it is important to determine the role of Alfa Inorganics, Inc. and the telephone call from the Boston office of the BNDD. Neither may be considered a reliable informant's tip in the traditional sense. See, e. g. *Draper, supra.* At best the purchase order for the lithium aluminum hydride might be considered a "red flag," not different from an unusual purchase of very high quality paper of the kind used in the printing of counterfeit currency. See *Newcomb, supra.* Absent here, *inter alia,* is an informant's tip of criminal activity, the details of which could be corroborated through surveillance. See United States v. Soyka, 394 F.2d 443 (2d Cir. en banc 1968). At best, the purchase order and telephone call to Agent Mihok were enough to arouse the suspicions of an alert agent, as they did.

Absent here, too, is any evidence that the defendant was engaged in flight immediately before arrest, that he attempted to hide his activities, that he knew that he was being followed, or that he was about to destroy the evidence. See *Soyka, supra.* His activities throughout the surveillance, taken together were generally innocent. His basement laboratory was in easy view of anyone passing by on the nearby sidewalk. He did not attempt to hide the fact that he was carrying material into and out of his truck and the residence. Doubtless the purchase of a chemical commonly used in the manufacture of illegal drugs was suspicious, but he has never observed either making or selling illegal drugs. No testimony was offered relative to some peculiar characteristics that the paper bags, which defendant was observed removing from his father's house immediately before his arrest, might have had in terms of the narcotics agent's expert eye. See *Henry, supra,* 361 U.S. at 103–04, 80 S.Ct. 168, 4 L.Ed.2d at 139. Although the agents knew that the de-

fendant had a Ph.D. in chemistry, they did not check to determine whether he had a license to conduct research with any controlled substances until after he was arrested. The court does not say this point, or any other single point, is crucial, but, in the absence of any reasonable indications of criminal activity prior to arrest, the point should be raised.

Although the defendant's activities, in the light of his purchase, his signing of another's name upon receipt, and perhaps, his attire and appearance, were surely suspicious, the surveillance had not gone far enough at the time of arrest to permit the discovery of circumstances constituting probable cause. That defendant associated with Jenny Burke, who has never been arrested for a narcotics offense, but who is the daughter of Dr. Fiedler, who has been arrested for a narcotics offense, is, under the circumstances of this case, insignificant. So also, that the visitors to defendant's home on New Year's Eve were known to the agents to associate with drug users, but were not known to be drug users themselves, is of little probative value. Finally, defendant's use of the Canisius College stationery was without more merely suspicious since, as was brought out by the defendant during the hearing, this stationery is for the use of students and is freely available at the campus bookstore.

Viewing all the circumstances together, see United States v. Olsen, 453 F.2d 612 (2d Cir. 1972), the court finds that defendant's arrest was precipitous and without probable cause. The fruits of the search incident to arrest are therefore inadmissible. The affidavits for the search warrants are substantially based on defendant's illegal arrest and the incidental search, are therefore insufficient, and items seized pursuant to those warrants are inadmissible. Because of this ruling, the additional grounds urged by defendant for relief are not discussed.

The defendant's motion is granted.

So ordered.