UNITED STATES of America,
Plaintiff-Appellee,

v.

Kenneth MARTIN, Defendant-
Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

James E. RATHBUN,
Defendant-Appellant.

Nos. 74–1712, 74–1713.

United States Court of Appeals,
Ninth Circuit.

Jan. 20, 1975.

Certiorari Denied May 12, 1975.

See 95 S.Ct. 1958.

John W. Keker (argued), San Francisco, Cal., for defendants-appellants.

Chester G. Moore, Asst. U. S. Atty. (argued), San Francisco, Cal., for plaintiff-appellee.

Before DUNIWAY and CHOY, Circuit Judges, and SMITH,[*] District Judge.

## OPINION

DUNIWAY, Circuit Judge.

Martin was convicted under separate counts charging manufacturing and possessing a controlled substance (methamphetamine) with intent to distribute it, in violation of 21 U.S.C. § 841(a)(1). Rathbun was convicted of possession of heroin, in violation of 21 U.S.C. § 844. We affirm.

### 1. *Statement of Facts.*

On September 25, 1973, an employee of Central Scientific Co. ("CSC"), a scientific supply company in Santa Clara, California, about 40 miles from San Francisco, notified the San Francisco office of the Drug Enforcement Administration ("DEA") that a person identifying himself as Kenneth Martin and as a representative of San Francisco-based Nevada Pacific Specialties ("NPS"), using an NPS purchase order, personally placed an order for various articles of glassware and chemicals.[1] Items ordered by Martin included chemical glassware and substantial quantities of activated charcoal, acetone, isopropyl alcohol, and vacuum oil.

The next day, DEA agents watched CSC and saw Martin sign in his own name and pay cash for the purchases, to which had been added a quantity of ether anhydrous. Martin had arrived driving a panel truck. The agents learned that the truck was registered to one O'Brian, who had also made purchases from CSC, using NPS purchase orders.

After loading the items into the panel van, Martin did not head for San Francisco. Instead, he drove south, away from San Francisco. He was continually watched, and was seen making two U-turns and several brief stops, but without leaving the car, just before he reached his home in Cupertino. When Martin arrived at his home, he and his wife carried the contents of the van into the house. Shortly after, a red Toronado car arrived at the house.

From about 5:00 P.M., the agents, who had obtained permission from the owner of adjoining premises to enter his yard, stationed themselves behind a fence immediately adjacent to the Martin property. They smelled ether and acetone, heard the running of water and clinking of glassware, saw Martin pouring liquids from one container to another, and saw five-gallon cans, several boxes on a table, and later a jug containing an orange liquid with a white precipitate.

At about 7:45 P.M., Mrs. Martin left the house, drove off in a car, and was followed by two agents. Another agent approached the Martin house and knocked on the door. A man answered at a window and the agent asked the whereabouts of a fictitous person. The agent left and rejoined the agents in the neighbor's yard. The two agents watching Mrs. Martin also returned. Martin then left the house, walked up and down the street, and met Mrs. Martin in the driveway when she returned. The two then drove to a parking lot and parked, facing the traffic and with the car lights turned off. When Martin left the house, the odors of acetone and ether stopped being noticeable by the agents.

---

[*] The Honorable Russell E. Smith, Chief Judge, United States District Court for the District of Montana, sitting by designation.

[1.] Both Martin's and NPS' names were on a list supplied by DEA to scientific supply companies such as CSC. This fact, however, we disregard. There is nothing in the record as to why the names were on the list.

Later, the Martins returned to the house, the odors were again noticeable, and sounds of running water and clinking glassware were again heard.

Rathbun had arrived at the house during the evening. About 11:00 P.M., the agents saw Martin and Rathbun removing some of the items seen in the house and placing them on the back seat and in the trunk of the Toronado, which was parked in the driveway. These included the jug with the precipitate. The two got into the car and drove away. Within a few minutes, the DEA agents stopped the car and arrested them both. A search of the car's back seat revealed the jug—later found to contain 146 grams of pure methamphetamine—and the agents found a small amount of heroin and narcotics paraphernalia on Rathbun's person.

After indictment, appellants moved to suppress all the evidence seized. This appeal challenges the district court's denial of their motion.

### 2. *Probable Cause for Arrest.*

■ Appellants argue that the evidence should have been suppressed because it was obtained incident to an unlawful arrest. Wong Sun v. United States, 1963, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441. Whether a warrantless arrest is constitutionally valid depends upon whether, at the moment of arrest, the officers had probable cause to make it. United States v. McDowell, 9 Cir., 1973, 475 F.2d 1037, 1039. Arresting officers have probable cause if, at the moment of arrest, "the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [arrested person] had committed or was committing an offense." Beck v. Ohio, 1964, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142; United States v. McDowell, *supra*. In applying these standards, we must consider *all* the facts known to the officers and consider *all* the reasonable inferences that could be drawn by them before the arrest. Rodg-

ers v. United States, 9 Cir., 1959, 267 F.2d 79, 85. The question is one of fact, and each case necessarily turns on its own peculiar facts.

Martin and Rathbun, in their briefs, analyze each bit of information that the officers had, demonstrate to their satisfaction that each is innocent on its face, and conclude that, whether they be considered singly or together, these bits of information do not amount to probable cause. We cannot agree, although we do agree that the case is a close one.

We think that this is a case, like United States v. Patterson, 9 Cir., 1974, 492 F.2d 995, 997, in which "[t]he succession of superficially innocent events had proceeded to the point where a prudent man could say to himself that an innocent course of conduct was substantially less likely than a criminal one."

■ Consider what the officers knew: First, Martin purported to purchase chemicals and supplies for NPS of San Francisco. He arrived in a car belonging to another man who had also placed such orders for NPS. But rather than heading for NPS in San Francisco, he headed in the opposite direction, toward Cupertino. The officers could wonder why.

Second, when Martin got near to his home, he made two U-turns and several stops. The officers could wonder whether he feared that he was being followed. The time when Martin would be most concerned about a "tail" would be when he was nearly home—not when he was en route on major thoroughfares.

Third, at Martin's home, the chemicals and supplies, which could be used to make methamphetamine as well as many innocuous things, were taken inside.

Fourth, beginning at about 5:00 P.M., and continuing to about 11:00 P.M., Martin and others were doing work which could produce methamphetamine, but could also produce perfectly legal products. The officers could wonder why they were doing what they did at home and during the late evening.

Fifth, after a fictitious inquiry, Martin went outside, waited for his wife, and when she arrived they proceeded to a place where they could survey the scene. The officers could take this to show a fear of being watched and a consciousness of wrongdoing.

Sixth, at the rather late hour of 11:00 P.M., Martin and Rathbun loaded a jug which could well have contained methamphetamine, together with other things, into the Toronado and took off. Why?

We think that this behavior, coupled with what had gone before, could give the watching agents, as prudent men familiar with the unlawful making of the drug, cause to believe that Martin and Rathbun had committed or were committing an offense. Beck v. Ohio, *supra*. The stop, arrest, and search were valid because they were based upon probable cause.

### 3. *Invasion of Privacy.*

■ Martin and Rathbun mount one other attack upon the arrest and search. They argue that when the officers looked through and over the fence, and used their noses to smell ether and acetone, they were invading a constitutionally protected zone of privacy—the Martin house. Not so. The officers had a right to be where they were. They did not invade the Martin premises. They saw what they saw because it was visible from where they were. Martin and his cohorts may have believed that they enjoyed complete privacy, but they did not, not because of anything that the agents did, but because of what they did. The neighbor would not have violated their rights by seeing and smelling what the officers saw and smelled. The officers did no more.

No case cited by the appellants goes so far as Martin and Rathbun would have us go here. In the case on which they most heavily rely, the watching agents had unlawfully invaded the defendants' private property and peered through his windows. Texas v. Gonzales, 5 Cir., 1968, 388 F.2d 145. Nor does Katz v. United States, 1967, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576, help the appellants. There, agents overheard Katz's conversation in a public telephone booth by means of an electronic device attached to the outside of the booth. In effect, the device took them inside. We find nothing in the *Katz* opinion indicating that if an officer had merely stood outside the booth and heard what Katz was saying, Katz's rights would have been invaded. Eavesdropping from a place where the officer has a right to be is a long-accepted technique of crime detection, not outlawed by the Fourth Amendment. If Katz had talked loud enough to be overheard, his expectation of privacy would be gone. So here the activities in the Martin house were conducted in such a manner as to be seen and smelled from the adjoining property. Whatever expectation of privacy Martin and his cohorts had was defeated by their own activities. See Ponce v. Craven, 9 Cir., 1969, 409 F.2d 621, 624–625; Gil v. Beto, 5 Cir., 1971, 440 F.2d 666.

Affirmed.

CHOY, Circuit Judge (dissenting):

I respectfully dissent. Although I agree with my Brothers Duniway and Smith that the police observations did not amount to an illegal search and seizure, I find that the sightings contributed very little to the Government's attempt to establish probable cause. The four-hour surveillance of the house which revealed the clinking of glasses, the movement of laboratory equipment and boxes, and the smell of ether and acetone, proves nothing more than that the Martins may have been operating some type of laboratory in their home.[1]

---

1. The expert testimony was as follows:

Q. Now taking that list and combining it, is there any particular chemical reaction that comes to mind when you smell acetone and ether at the same time?

A. Well, for one thing, ether has a very pungent smell and I question I would be able to detect acetone.

Q. What?

A. I don't recall how you smell both at one time.

But such an inference was already justified by the mere fact that Martin picked up a quantity of laboratory supplies and unloaded them at his house.

The only significant sighting by the police was the jug containing an orange liquid with a white precipitate. The jug, however, no more establishes probable cause than does the mere evidence of Martin's purchase of chemicals and equipment. Although a colored liquid with a light precipitate is an element common to a methamphetamine laboratory, it is equally true that countless chemical processes result at some point in such a liquid.

Even considering the colored liquid evidence in conjunction with the evidence of chemicals and laboratory equipment and the smell of ether and acetone, the only reasonable inference is merely that a chemical laboratory was in operation. According to undisputed expert testimony at the suppression hearing, there was no more reason that such evidence pointed to methamphetamine production than to a legitimate chemical reaction, such as the isolation of the essence of roses.[2] Thus, absent evidence that Martin ordered or possessed precursors of methamphetamine or other ingredients critically important to its manufacture, that Martin used a fictitious name in ordering the chemical, or that appellants' conduct was otherwise suspicious,[3] the agents lacked probable cause to arrest.[4]

I would reverse the convictions.

---

Q. Assuming that you did smell both acetone and ether, would that lead you to conclude, or even conjecture that any particular chemical reaction was going on?
A. No.
(Pre-trial Tr. 86–87)

2. The expert testimony was as follows:
Q. If you took that list of chemicals and knew that they were at a place from which you could smell both ether and acetone and added to that the sighting of an orange liquid with a white precipitant [sic], what conclusion would you then draw?
A. I would still conclude I am working in a chemical laboratory.
Q. Is there anything about those facts, standing alone, that would point you to the direction of illegal drug manufacture, as opposed to a chemical laboratory working?
A. Standing alone, a chemical laboratory, nothing more.
(Pre-trial Tr. 87)

3. The Government contends that the appearance of Martin's and NPS's names on the DEA list submitted to chemical supply houses tends to support a finding of probable cause. However, the fact that DEA may have suspected Martin or the company of illegal activity is entitled to no weight. *See* Spinelli v. United States, 393 U.S. 410, 414, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

4. The facts available to the agents in this case were far less incriminating than those found to establish probable cause in the following methamphetamine cases: United States v. Welebir, 498 F.2d 346 (4th Cir. 1974) (purchase of precursors; informer tip that defendant intended to set·up laboratory for illicit drug manufacture); United States v. Noreikis, 481 F.2d 1177 (7th Cir. 1973), cert. denied, 415 U.S. 904, 94 S.Ct. 1398, 39 L.Ed.2d 461 (1974) (police affidavit that defendants possessed precursors; lithium aluminum hydride traced to the house); United States v. Moore, 452 F.2d 569 (6th Cir. 1971), cert. denied, 407 U.S. 910, 92 S.Ct. 2435, 32 L.Ed.2d 684 (1972) (delivery of precursors to mail drop; use of fictitious names; activities within building outside normal working hours). *Cf.* United States v. Ortiz, 445 F.2d 1100 (10th Cir.), cert. denied, 404 U.S. 993, 92 S.Ct. 541, 30 L.Ed.2d 545 (1971) (presence of precursors inside defendant's cabin and discovery of methamphetamine outside nearby found sufficient to sustain conviction for manufacturing illicit drug).

And at least one court has ruled that facts much more incriminating than those shown in this case failed to establish probable cause. United States v. Failla, 343 F.Supp. 831 (W.D. N.Y.1972). In that case, the agents knew at the moment of arrest that defendant had ordered lithium aluminum hydride, used another's name, and operated a laboratory in his basement.