UNITED STATES of America, Plaintiff-Appellee,

v.

Turner Edward WILLIAMS, Elizabeth Lee Scalf, and Cody Middleswart, a/k/a Charles David Williams, a/k/a Cody Woodward, Defendants-Appellants.

No. 78–5366.

United States Court of Appeals, Fifth Circuit.

Oct. 4, 1979.

Rehearing and Rehearing En Banc Denied Oct. 31, 1979.

Richard S. Rhodes, Orlando, Fla. (Court-appointed), for Williams.

Marc L. Lubet, Orlando, Fla. (Court-appointed), for Scalf.

Bryan C. Hugo, Altamonte Springs, Fla. (Court-appointed), for Middleswart.

Mark L. Horwitz, Asst. U. S. Atty., Orlando, Fla., for plaintiff-appellee.

Before THORNBERRY, GOLDBERG, and GEE, Circuit Judges.

GEE, Circuit Judge:

Defendants Turner Williams, Elizabeth Scalf, and Cody Middleswart appeal from their convictions for conspiracy to manufacture phencyclidine hydrochloride (PCP), a controlled substance, and defendants Williams and Scalf appeal from their convictions for attempting to manufacture that substance. All defendants challenge the affidavit supporting the request for a search warrant and appeal the denial of their mo-

tions to suppress the evidence seized pursuant to the warrant. The defendants also challenge the sufficiency of the evidence to support each conviction. We affirm all convictions.

We begin by setting out the facts in some detail.[1] On January 25, 1978, an individual who signed purchase forms as "Cody Middleswart" purchased a number of chemicals[2] from Biscayne Chemical Laboratory in Miami, Florida. The chemicals ostensibly were purchased for Continental Salvors, but the address and phone number listed on the form were for Middleswart's one-bedroom efficiency apartment in New Smyrna Beach, Florida. Because Biscayne Chemical did not have piperidine or sodium meta bisulfite in stock, these items were back-ordered and were shipped to Middleswart's apartment on March 7, 1978.

On February 18, 1978, Turner Williams came to Biscayne Chemical and exchanged the distilling apparatus previously purchased by Middleswart for Continental Salvors. While there, Williams also purchased a large quantity of ethyl ether. This purchase was observed by DEA Agent Robert Cushing, who had been called by the salesperson at Biscayne Chemical, and Williams signed the required form acknowledging that the chemicals were hazardous. Agent Cushing followed Williams from Biscayne Chemical but had to discontinue his surveillance because of Williams' evasive driving. Earlier in February of 1978, a woman who identified herself as "Mrs. Scalf" had ordered twelve bottles each of bromobenzene and piperidine by telephone from Fisher Scientific Company in Orlando, Florida. The order was placed in the name of Continental Salvors, and the address given was that of the residence of defendants Scalf and Williams (her son). Payment for this order was remitted by Continental Salvors by a cashier's check purchased by Mrs. Scalf, a copy of which was later found in the Scalf residence.

By mid-February government agents, whose suspicions were aroused by these purchases of chemicals necessary to the manufacture of PCP, had defendants under near-constant surveillance. The agents arranged to make controlled deliveries of the chemicals still on order, and on March 13, Mrs. Scalf accepted delivery of the chemicals ordered from Fisher Scientific. Agent Tom Fair, posing as a deliveryman, placed the chemicals inside the Scalf residence at her direction. She signed for the delivery in the business name and told Agent Fair that the chemicals were needed for her film developing operation. The chemicals back-ordered from Biscayne Chemical Laboratory were delivered on March 21 to Middleswart at his apartment by a DEA agent posing as a deliveryman. Middleswart, expressing surprise that boxes containing "toxic, corrosive and highly combustible chemicals" were not better marked, signed his name and Continental Salvors and paid for the delivery. Middleswart placed the box of chemicals in his van, where they remained until that evening when Scalf and Williams came to his apartment. The two men transferred the boxes into the Scalf automobile, and Scalf and Williams took the chemicals back to their residence. Williams took the boxes of chemicals inside and was observed removing the bottles. He later disposed of the empty boxes in a convenience store garbage dumpster approximately two blocks from the house.

Three days later, DEA agents executed a search warrant at the Scalf residence. As the agents approached the house and identified themselves, Mrs. Scalf said, "I know what you are looking for. It's in the bathroom." Turner Williams came in while the warrant was being read, and both he and Mrs. Scalf were advised of their constitutional rights. Mrs. Scalf offered to aid the

---

1. We are, of course, considering the evidence in the light most favorable to the verdict. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

2. The chemicals purchased were piperidine, sodium cyanide, sodium meta bisulfite, bromobenzene, iodine crystals, cyclohexanone, methyl ethyl ketone, and ethyl purified. A glass distilling apparatus was also purchased on this date.

agents and asked what they were looking for. On being told the search was for PCP precursors, the woman replied, "It's in the bathroom. Got it locked." Chemical bottles[3] and boxes were found stacked in the bathroom. Also discovered were a gas mask and a triple-beam scale in a closet and a box of magnesium metal turnings on a shelf in the garage. When told that the agents were also seeking formulas, papers, and notes, Mrs. Scalf produced a piece of paper from the bedroom dresser and explained that it was a formula. Mrs. Scalf also admitted writing Fisher Scientific's phone number and the lot order numbers of the chemicals obtained from that company on a piece of paper found in the kitchen. During the search, defendant Middleswart had been arrested, given *Miranda* warnings, and brought to the Scalf residence. He immediately asked to speak to the agent in charge and stated, "Well, I'd like to cooperate," but "you know what's going on." The defendants were then transferred to an Orlando jail, where Williams asked why the officers had not waited another week or two. When the agent did not respond to the question, Williams told him, "If you'd have waited a week or two weeks, you would have gotten both labs." Later at the preliminary hearing, Mrs. Scalf told another federal officer, "If you'd waited, you would really have some paper work to take care of, to do." At trial a government chemist testified that the items seized were in fact the chemicals described on the containers by the manufacturers. He further stated that although the written formula was only an outline of a procedure to manufacture PCP and would require some additional knowledge of the process, the controlled substance could be produced by following the formula and by using the chemicals seized from the Scalf residence. The government chemist did just that before trial, and he testified that six pounds of PCP could have been produced from the chemicals found in the Scalf home.

*Probable Cause to Search*

██ All defendants, in identical, verbatim arguments, contend that the affidavit was insufficient to allow the magistrate to make an independent determination that probable cause existed to issue the search warrant as required by *Agular v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Specifically, they argue that the affidavit was based on double hearsay, traced only two chemicals—piperidine and bromobenzene—into the Scalf residence, did not establish the reliability of the confidential informant or of his information, and showed only innocent activities. These contentions are without merit. The affidavit stated that the affiant had talked by telephone with an Arizona narcotics investigator, who had received information from a confidential informant. The informant had provided a tip that defendants were going to manufacture and distribute PCP from a clandestine laboratory at Scalf's home. The affidavit expressly stated that the informant, on many occasions, had provided reliable information that led to the arrests of persons for narcotics violations. The informant's reliability was fully established by the explicit claim of past reliability made by the Arizona officer to the affiant. *United States v. Kilrain*, 566 F.2d 979, 983–84 (5th Cir.), *cert. denied*, 439 U.S. 819, 99 S.Ct. 80, 58 L.Ed.2d 109 (1978); *see United States v. Tucker*, 526 F.2d 279, 281 (5th Cir.), *cert. denied*, 425 U.S. 958, 96 S.Ct. 1738, 48 L.Ed.2d 203 (1976). Defendant Middleswart told the informant that he, Scalf, and Williams were about to become involved in the manufacture and distribution of PCP. It seems apparent to us that this personal knowledge of the informant, gleaned from a face-to-face conversation with the defendant, established the reliability of his information, as well. *United States v. Tucker, supra.*

---

**3.** The evidence seized at the Scalf residence included sodium meta bisulfite, bromobenzene, cyclohexanone, ethyl ether anhydrous, sodium cyanide, muratic acid, iodine crystals, and piperidine.

■ Moreover, there was sufficient independent corroboration of the tip to support issuance of the warrant. Defendants made separate purchases of chemicals recognized by government agents and a DEA chemist to be necessary to the manufacture of PCP; the chemist, when read a list of the chemicals purchased by Middleswart and Williams, told the affiant that only magnesium metal turnings, an easily obtainable item, were lacking and that someone was manufacturing PCP. Each defendant represented that the chemicals were being purchased for a business, yet two different residential addresses for the same business were given—that of the apartment of Middleswart and that of the single-family dwelling of Scalf. The chemicals were received by Middleswart at his apartment and held there until Scalf and Williams removed them to her home. Government agents delivered the PCP precursors piperidine and bromobenzene to Scalf's home, and surveillance revealed that the chemicals were being stored in the home. Moreover, the DEA chemist informed the affiant that Scalf could not possibly be using piperidine and bromobenzene to process film, as she had claimed during the controlled delivery. Finally, Williams, who also resided at the searched home, drove erratically and evaded surveillance on one occasion after making a large purchase of chemicals and on another occasion drove two blocks away from his home to dispose of empty chemical boxes. After considering the totality of the averments in the affidavit and the practical inferences that may be drawn from them, it would have been surprising indeed had the magistrate refused to issue the warrant.[4] See United States v. Gordon, 580 F.2d 827 (5th Cir.), cert. denied, 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978).

### Conspiracy

All defendants challenge the sufficiency of the evidence to sustain their conspiracy convictions. They contend generally that the government failed to prove that an agreement to manufacture PCP existed, and each defendant argues that even if such a common plan were proved, the government did not establish their knowing participation in it.

■ We think the evidence easily sufficient for the jury to conclude that an illegal agreement to manufacture PCP existed and that Scalf and Williams were knowing participants in it. Each purchased chemicals by using the same company name; as a

4. The case on which defendants rely primarily, United States v. Failla, 343 F.Supp. 831 (W.D. N.Y.1972), can be distinguished easily. In that case the court granted a motion to suppress evidence seized incident to an arrest that it found to be without probable cause. Defendant Failla purchased a chemical used to manufacture MDA, an amphetamine and a controlled substance, and government agents were informed of this purchase. After a controlled delivery of the chemical and a two-day surveillance, Failla was arrested, and paper bags containing a controlled amphetamine were discovered in his car. The court found that the arrest was without probable cause and suppressed the evidence on the theory that only innocent, albeit suspicious, activity had been observed during police surveillance. Defendants maintain that in the present case, as in the Failla case, mere purchase, transportation, and storage of chemicals were innocent and legal acts and that Failla mandates a reversal of their convictions. A closer reading of Failla, however, reveals that the court there emphasized that there was no informant's tip of criminal activity, as there was here, which could be corroborated through surveillance. Id. at 835. The affiant in the case before us presented the magistrate a tip of criminal activity obtained from a reliable informant from a personal conversation with the defendant. This tip was corroborated by independent police investigation. Failla is simply inapposite.

Defendants also argue that the information was too stale to constitute probable cause; the basis of this argument is that the confidential informant gave his tip to the Arizona police officer "within the last six months." We need not address the issue whether a six-month-old tip is too stale, however, because the magistrate was not limited to that single piece of information in his determination of probable cause. The affidavit described a continuing course of conduct, which had been under observation for more than two months and which was ongoing when the warrant was executed. Staleness is to ·be determined on the facts of each case, e. g., Bastida v. Henderson, 487 F.2d 860 (5th Cir. 1973), and we decline to disturb on staleness grounds the finding of probable cause.

business address for that business, Williams gave that of Middleswart's apartment, and Scalf gave her own home address. Volatile and potentially dangerous chemicals were stored in the bathroom of the Scalf-Williams home, as were magnesium metal turnings and a gas mask. The chemicals purchased and stored were all those necessary for the manufacture of PCP, and the metal turnings were also needed for the manufacturing process. A piece of paper, which contained writing identified by Scalf to be a formula, was found in the home. A government chemist testified that it was, in fact, an outline of the manufacturing process and himself produced PCP by using the formula and the chemicals stored in the defendants' home. Mrs. Scalf explained that she needed the chemicals she ordered for film developing, but no film, reels, dark room, or film developing apparatus was found in the home, and the government chemist testified that he knew of no household use for any of the chemicals found, with the single exception of muratic acid. Moreover, post-arrest statements of Scalf and Williams clearly showed their knowledge and intent. While executing the search warrant, an agent told Mrs. Scalf that they were looking for "PCP precursors." Immediately she told them that they were in the bathroom and directed the agents to the chemicals. Later during the search, she handed another agent a piece of paper and herself called it a formula. Finally, Williams told one of the agents that they would have gotten "both labs" if they had waited a week or two. Although the government introduced no direct evidence or proof of a formal agreement, such proof is not necessary to establish a criminal conspiracy. *E. g., United States v. Bright*, 550 F.2d 240 (5th Cir. 1977). The government here proved by circumstantial evidence the common plan to manufacture PCP and knowing acts by Scalf and Williams to further its illegal purpose. We cannot say that the jury must necessarily have entertained a reasonable doubt about their guilt.

The evidence against Cody Middleswart is not overwhelming, but we think it sufficient to sustain his conviction. We have held that the conspiracy existed, and Middleswart obviously cannot deny performing acts to further its purpose. Middleswart claims only that he had no knowledge of the conspiracy when he purchased chemicals on one occasion, received them on another, and transferred the latter shipment to Scalf and Williams for transportation to their home. Yet when purchasing a large quantity of chemicals in January, he represented that Continental Salvors was located at "300 Flager, Suite 1." This address was his small efficiency apartment, and the jury properly could infer that he intended to deceive the salesperson at Biscayne Chemical by appearing to purchase chemicals on behalf of an ongoing business operating out of a suite of offices. Middleswart's knowledge also was demonstrated by his post-arrest statement that he would like to cooperate with the arresting agents but, "You know what's going on." Although defense counsel ably has argued possible innocent interpretations of this remark, we think the jury properly could infer with reason that Middleswart recognized that the government agents now knew what he knew: that the chemicals in the bathroom had been gathered so that a clandestine lab could be set up to manufacture PCP. We do not reverse a jury verdict simply because we might have drawn a contrary inference had we been jurors in the case. To sustain a conviction we must be satisfied that reasonable jurors could find the evidence inconsistent with every hypothesis of the accused's innocence. *E. g., United States v. Ragano*, 520 F.2d 1191 (5th Cir. 1975), *cert. denied*, 427 U.S. 905, 96 S.Ct. 3192, 49 L.Ed.2d 1199 (1976). This test has been satisfied.[5]

*Attempt*

Defendants Scalf and Williams also argue that their convictions for attempt to

---

**5.** No longer is the "slight evidence rule" the rule in this circuit to review evidence of a defendant's knowing participation in a criminal conspiracy. *United States v. Malatesta*, 590 F.2d 1379 (5th Cir. 1979) (en banc). We consider Middleswart's acts and words to be substantial evidence of his knowing involvement in the common scheme.

manufacture PCP must be reversed for insufficient evidence. They contend that no more than "mere preparation" was shown; they rely on the fact that although chemicals were purchased and stored in their home, no lab had been set up, only one or two bottles had been opened, and no chemicals had yet been mixed together. We reject this argument.

In *United States v. Mandujano*, 499 F.2d 370 (5th Cir. 1974), *cert. denied*, 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975), this circuit set out a two-step test for use in grappling with the slippery "mere preparation"/criminal attempt issue. For a defendant to be guilty of an attempted crime, he must have been acting with the kind of culpability otherwise required for the commission of the substantive crime that he is charged with attempting, and he must have engaged in conduct that constitutes a substantial step toward commission of the crime. The court went on to define a substantial step as "conduct strongly corroborative of the firmness of the defendant's criminal intent." *Id.* at 376. In *United States v. Oviedo*, 525 F.2d 881 (5th Cir. 1976), we emphasized that a defendant's objective acts must mark his conduct as criminal, without any reliance on the accompanying *mens rea*. We said in that case that the objective acts "should be unique rather than so commonplace that they are engaged in by persons not in violation of the law." *Id.* at 885.

Scalf and Williams rely on *Mandujano* and *Oviedo* and characterize their objective acts as entirely consistent with innocent activity. This reliance is misplaced. The concern in *Oviedo* was that no defendant be convicted of an attempted crime where criminal intent is based solely on acts consistent with a noncriminal enterprise. *United States v. Hough*, 561 F.2d 594 (5th Cir. 1974). Here the presence of the PCP formula at the Scalf-Williams residence, Williams' evasive driving after purchasing chemicals while under surveillance, Scalf's

untrue explanation of her need for the chemicals, and the post-arrest statements of each, when taken as a whole, strongly and unequivocally corroborate the required culpability. *See United States v. Korn*, 557 F.2d 1089 (5th Cir. 1977).

AFFIRMED.