16 F.3d 1223
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellant,
v.
Bud RIGGINS and Donald McVean, Defendants-Appellees.
 Nos. 93-5075, 93-5076.
 United States Court of Appeals, Sixth Circuit.
 Feb. 23, 1994.
 
 Before: GUY and SILER, Circuit Judges; and CHURCHILL, Senior District Judge.*
 PER CURIAM.
 
 
 1
 After a jury trial, defendants were convicted of conspiracy and attempt to manufacture a controlled substance, in violation of 21 U.S.C. Sec. 846, as well as possession of triple-neck round-bottom flasks with intent to manufacture a controlled substance, in violation of 21 U.S.C. Sec. 843(a)(6). Defendants filed a post-trial Rule 29 motion for judgment of acquittal, which the district court granted. The government now challenges the court's decision. Finding that a reasonable jury could have concluded that defendants' conduct satisfied, beyond a reasonable doubt, the elements of the charged offenses, we reverse and remand.
 
 I.
 
 2
 In May 1991, Bud Riggins placed an order for ten kilograms of isosafrole and twenty liters of methanol with Eastman Fine Chemicals ("Eastman") of Rochester, New York. For numerous reasons, Riggins's isosafrole order aroused the suspicion of Richard Hapeman, Eastman's manager of quality assurance. For instance, isosafrole was, at the time, a chemical found on the DEA's " 'watch list,' an informal list of chemicals often used illegally which is published to suppliers."[1] In addition, the order was far larger than standard orders, which typically do not exceed one kilogram. Hapeman also noted that Riggins did not appear to be using a business address, and that the business Riggins had listed, Logan Ag Lab & Supply, had never before placed an order with Eastman. Furthermore, Riggins initially informed Hapeman that he wanted the chemicals shipped COD, a request that Hapeman could not honor given company policy. That Riggins would decide to initiate dealings with Eastman at that point seemed particularly strange to Hapeman, especially since, as Hapeman surmised, Riggins could have sought out other suppliers that were not only geographically closer to him, but also could offer a better price.
 
 
 3
 Dubious as to Riggins's intentions, Hapeman sought and obtained Riggins's written assurance that the chemicals would not be used in any food or drug or in a residential setting. Hapeman also contacted the DEA, notifying the agency as to his suspicions. The case was then referred to the DEA office in Louisville, Kentucky. Louisville DEA agents contacted the DEA laboratory in Chicago and were informed that isosafrole is a precursor to the manufacture of 3, 4-methylenedioxyamphetamine ("MDA"), a schedule I hallucinogen under 21 U.S.C. Sec. 812.
 
 
 4
 After getting confirmation from Eastman that Riggins had indeed placed the order in question, Louisville DEA Agent Gary Tennant decided to make a controlled delivery of the chemicals. Although a perusal of the local phone book did not reveal a phone number for either Riggins or the Logan Ag Lab & Supply Company, Tennant did manage to find a number to call by consulting various shipping documents. The individual who answered the call, "Don," instructed that the delivery be made to an airplane hanger on Riggins's farm in Logan County, Kentucky.
 
 
 5
 After the isosafrole package had been equipped with a beeper transmitting device, a delivery for the full amount under Riggins's order took place on June 10, 1991. A person identifying himself as Clarence Gamble[2] accepted the delivery. As the delivery was being made, Tennant noticed a "distinctive chemical smell," which he associated with acetic anhydride, a substance used in the production of amphetamines. The DEA continued their surveillance of the area for nearly 40 hours.
 
 
 6
 On June 11, 1991, the DEA, accompanied by state and local police, executed a search of the hanger and the surrounding area. As the investigators arrived on the scene, Riggins remarked: "[Y]ou are here about them chemicals ain't you." (App. 234.) He then informed the agents that he had removed the isosafrole and methanol from the hanger to a residence on the property. At the time, the residence, though owned by Riggins, was occupied by Donald McVean, a friend and business associate of Riggins. During the search of the hanger, DEA Agent Arnold Fitzgerald, much as Tennant had done the day before, noticed the smell of acetic anhydride.[3] The search did, in fact, uncover acetic anhydride as well as hydrobromic acid and 11 marijuana plants. Perhaps as revealing as what the agents did find was what they did not find: "There was no evidence found indicating the existence of a legitimate chemical business. "There was no evidence of the presence of fire safety equipment or use of safety storage principles."
 
 
 7
 The agents also searched Riggins's pick-up truck, which was parked outside the hanger. In the back seat, they found a book entitled "Drug Manufacturing for Fun and Profit." While the book did not include a recipe for MDA, it did devote a chapter to the manufacture of dimethyltryptomine, or "DMT," a controlled substance manufactured in much the same way as MDA.
 
 
 8
 The most plentiful source of evidence turned out to be Riggins's residence, located in a large clearing at a "considerable distance from any other building" on the farm. While the agents left the premises to secure a search warrant for the residence, McVean was permitted to remain inside unattended for approximately 30 to 40 minutes. When the agents returned,[4] and immediately upon entering the residence, Tennant and Fitzgerald detected "a very pungent and strong smell of ether."[5]
 
 
 9
 A thorough search ensued after the agents ventilated the residence. In the living room, the agents noted the following "scattered about" items:
 
 
 10
 Isosafrole--(10) 1 kilogram bottles--full; (2) 500 milliliter bottles--full and 1/2 full
 
 Methanol--(1) 20 liter metal can--full
 
 11
 Ethyl Alcohol--(2) 4 liter bottles--full and 1/2 full
 
 
 12
 Sulfuric Acid--(1) 6 1/2 liter bottle--full and (1) 2 1/2 liter bottle-- 1/2 full
 
 
 13
 Hydrogen Peroxide 30%--(5) 500 milliliter bottles--full; (1) 4 liter glass bottle-- 1/2 full
 
 
 14
 Ethyl Ether (EM)--(10) 1 liter bottles--(9) full; (1) 1/2 full
 
 
 15
 Ethyl Ether (Fischer)--(1) 4 liter bottle-- 1/2 full
 
 
 16
 Alumina Activated--(1) 2 1/2 liter bottle--full
 
 Toluene--(1) 4 liter bottle--full
 
 17
 Formic Acid 88%--(4) 4 liter plastic bottles--3 1/4 full
 
 
 18
 Formic Acid--(2) 2/5 liter plastic bottles--full
 
 
 19
 Aluminum Metal--(2) 500 milligram plastic bottles--full
 
 
 20
 Isopropyl 70%--(12) 1 pint bottles--full (Wal-Mart brand)
 
 
 21
 Isatoic Anhydride--(1) 500 gram bottles--full
 
 
 22
 Muriatic Acid--(1) 1 gallon plastic bottle--full
 
 
 23
 Chromium Trioxide--(1) 1 liter bottle--full
 
 
 24
 Sodium Acetate--(1) 25 pound plastic bottle
 
 
 25
 The agents also discovered (3) 3,000 milliliter single neck flasks; (1) 1,000 milliliter single neck flask; and (1) hot plate.
 
 
 26
 In addition to a Lyman 500 scale, an Ohaus GT 8000 scale and (2) lab thermometers, a search of the kitchen yielded:
 
 Acetone[6]
 
 27
 Phosphoric Acid--(1) 2 1/2 liter bottle-- 3/4 full
 
 
 28
 Raney-Nickel[7]--(5) 100 gram metal containers--full (stored in refrigerator)
 
 
 29
 Chromium Trioxide--(1) 500 gram bottle-- 1/2 full
 
 Inositol[8]
 
 30
 Empty Gelatine Capsules[9]--(2) plastic zip lock bags containing approximately 420
 
 
 31
 In a first floor bedroom, the agents found a computer that was in the process of printing out documents. These documents, Riggins and McVean contend, were catalogs that they had intended to send to companies in the chemical supply industry. A search of another bedroom netted the agents a loaded .38 caliber Smith & Wesson revolver. The revolver was found on a night stand beside a bed. McVean apparently had been using the room as his sleeping area.
 
 
 32
 The agents also searched the attic. The items found there were particularly noteworthy because they had been concealed behind a sheet of plywood. Once McVean found out that the hiding place had been discovered, he said: "[O]h, shit."[10] The attic is where the agents located Riggins's and McVean's most sizable cache:
 
 
 33
 Hydrochloric Acid--(1) 2 1/2 liter bottle-- 3/4 full
 
 
 34
 Potassium Dichromate Merk--(1) 1 pound container--full
 
 
 35
 Ethyl Alcohol--(1) 4 liter bottle-- 1/10 full
 
 
 36
 Acetic Acid, Glacial--(1) 2 1/2 liter bottle--full
 
 
 37
 Ethyl Acetate--(1) 4 liter bottle-- 3/4 full
 
 Formamide--(1) 1 quart bottle--full
 
 38
 Diethyl Malonate--(1) 2 kilogram bottle-- 1/2 full
 
 
 39
 Phenylacetaldehyde--(2) 250 gram bottles-- 3/4 full each
 
 
 40
 1-Bromoethyl Benzene--(1) 100 gram bottle-- 1/2 full
 
 N-Butyl Chloride--(1) 4 liter bottle--full
 Nitric Acid--(2) 2 1/2 liter bottles--full
 
 41
 Titrant Standard Potassium Hydroxide Alcoholic--(2) 500 ML bottle--full
 
 Isosafrole--(3) 250 gram bottles--full
 
 42
 Isonitrosoproprophenone--(4) 1/2 quart bottles--full
 
 
 43
 Magnesium metal--(6) 500 gram bottles--full
 
 
 44
 Unknown liquid--(1) 4 liter bottle-- 1/4 full
 
 
 45
 Potassium Permanganate--(2) 500 gram bottles--full
 
 
 46
 Pyridine--(1) 1 one liter bottle-- 1/4 full
 
 
 47
 Phenylacetyl--(4) 100 gram bottles-- 3/4 full
 
 Toluidine--(1) 500 gram bottle--full
 
 48
 Acetyl Acetone--(2) 500 milliliter bottles--full
 
 
 49
 Carbon Tetrachloride--(1) 500 milliliter bottle--full
 
 
 50
 Phenylacetonitrile--(1) 1 kilogram bottle--full
 
 
 51
 Methyl Iodide--(1) 100 milliliter bottle--full
 
 
 52
 Chromium Trioxide--(1) 500 gram bottle--full
 
 
 53
 The attic also produced the following paraphernalia:[11] (3) 5,000 milliliter triple neck flasks, (3) 3,000 milliliter triple neck flasks, (4) 4,000 milliliter Pyrex beakers, (1) heating mantel (100 ml.),[12] separatory funnels, graduated cylinders, and condensers.
 
 
 54
 In March 1992, on the strength of the evidence obtained as a result of the searches detailed above, a federal grand jury returned a seven-count indictment naming Riggins and McVean as defendants. Specifically, the indictment listed several counts relating directly to the defendants' alleged MDA operation, including: conspiracy[13] (Count 1) and attempt[14] (Count 2) to manufacture MDA, in violation of 21 U.S.C. Sec. 846; and possession of triple-neck round-bottom flasks with intent to manufacture MDA, in violation of 21 U.S.C. Sec. 843(a)(6)[15] (Count 5). The indictment also contained two firearm charges: the use and carrying of a firearm, in violation of 18 U.S.C. Sec. 924(c) (Count 3); and possession of a firearm by a convicted felon,[16] in violation of 18 U.S.C. Sec. 922(g)(1) & (2) (Count 4). Finally, the indictment charged Riggins with two other drug-related offenses: manufacturing marijuana, in violation of 21 U.S.C. Sec. 841 (Count 6); and possession with intent to distribute marijuana, in violation of 21 U.S.C. Sec. 841(a)(1) (Count 7).
 
 
 55
 At trial, defendants attempted to portray their operation as a legitimate chemical supply and produce business, not an illicit drug manufacturing center. Testimony given during the trial established that the government tested samples of 10 out of the 41 substances found as a result of the search. The government's chemist, Odest Washington, opined that Riggins's farm provided an ideal setting for a clandestine laboratory because it was well hidden by trees. As to the chemicals found on the farm, Washington testified that eight of them could have been used to manufacture MDA: isosafrole, formamide, formic acid, sulfuric acid, hydrochloric acid, hydrogen peroxide, toluidine, acetone, and methanol.
 
 
 56
 Although virtually all of the ingredients to make MDA were thus present, Washington noted that several pieces of laboratory equipment vital to the manufacturing process were not. For instance, the government's search of Riggins's farm did not turn up a rheostat, a device for regulating temperature. In addition, the agents could not locate ring stands, clamps, or other apparatus designed to hold the equipment during synthesis. Finally, Washington observed that the heating mantle found in the attic of Riggins's residence would not have fit the 3,000 or 5,000 millimeter flasks that were also found in the attic.
 
 
 57
 At the close of the government's case and again, at the close of all the proof, defendants moved for a judgment of acquittal pursuant Fed.R.Crim.P. 29. On both occasions, the district court denied defendants' motions. Subsequently, the jury returned a not guilty verdict against Riggins on Counts 4, 6, and 7. The jury did, however, convict both defendants on Counts 1, 2, and 5, and McVean on Count 4.[17]
 
 
 58
 Defendants filed a post-trial motion for a judgment of acquittal or, alternatively, for a new trial. At a sentencing hearing held on December 11, 1992, the court considered the facts that militated in the government's favor:
 
 
 59
 [T]his is purely a circumstantial case, the circumstances favoring the verdict and the ... government's position.
 
 
 60
 First of all and most damning and unexplained is the existence of the ... empty capsules. Although there was proof that these are readily available new and could be bought from any health food store, nevertheless they were there. And for what purpose remains unexplained.
 
 
 61
 The fact that ten kilos isosaphrol and an unusually large order, whether one kilo is a normal amount, according to the testimony of the Eastman chemical man. The fact that Eastman finds they had never done business with this man before, didn't know who they were. The videotape of the premises certainly didn't look like any legitimate chemical supply business. No signs, no listed telephone, no license from the County Court Clerk to do business.
 
 
 62
 The fact that isosaphrol is a necessary precursor to the manufacture of MDA; that methanol may be used as a solvent. Methanol was also purchased. They used it as a solvent in the process.
 
 
 63
 The existence of the book didn't have a lot of probative value in the son's car. Well, Drug Manufacture [f]or Fun and Profit doesn't tell you how to make MDA. And that's what we're dealing with here. But it is a factor.
 
 
 64
 No customer receipts, no business records, nothing that would be normally found at a legitimate business. The chemicals were concealed in the attic behind ... a piece of plywood. And, of course, we have the opinion of the DEA agent and chemist that they thought that's what was going on there. It was that this was attempted to manufacture MDA.
 
 
 65
 (App. 91-93.)
 
 
 66
 In the eyes of the court, the following facts weighed against the government:
 
 
 67
 [T]here was no MDA on the premises, no evidence that they had ever completed the manufacture of MDA. Apparently there was no residue in the bottles. Of if there were the DEA failed to check for it. And no evidence of any residue completed the manufacture. No other evidence of conspiracy or agreement or specific intent to manufacture MDA. It's all fairly circumstantial. There's no, no co-conspirator statements or any other evidence of specific intent. It's a matter of inference from the circumstances. There was no base present. The necessary acetone was absent. Mr. Washington's testimony about the substitution was terribly weak. I don't think Mr. Washington himself felt acetone was an adequate substitute. I watched him testify in that respect but nevertheless acetone was not present.
 
 
 68
 There were no heating mantles to fit these 3,000 and 5,000 millimeter flasks. One that was present is too small for those. There was no rheostat for regulation of the temperature which is absolutely essential for the manufacture of MDA according to the testimony. There were lots of other chemicals present. Some 51 total chemicals were present when most of those were unnecessary for the production of MDA. There was no recipe for the manufacture of MDA.
 
 
 69
 The testimony was that is a very complex procedure. All the chemicals present had other uses besides the manufacture of MDA.
 
 
 70
 Now, for a conviction of conspiracy or for a conviction for intent it's not necessary that the act be completed, that MDA be finally manufactured or that they even have the ability to complete the effort to manufacture MDA. There are cases where the specific intent is proven, that the absence of essential ingredient is not faded. But in those cases there was, there was evidence, other evidence of specific intent rather than the mere inference of specific intent from the presence of the chemicals. And that's all we have here, counsel. Some of the necessary ingredients for manufacture of MDA were present.
 
 
 71
 (Id. at 93-95.) The court then added:
 
 
 72
 The Court has come to the conclusion that the proof is insufficient to prove guilt beyond a reasonable doubt. Motion for judgment of acquittal counts one, two and five by both Mr. McVean and Mr. Riggins will be granted.
 
 
 73
 (Id. at 95.) The government now appeals from this decision of the district court.[18]
 
 II.
 
 74
 On appeal, the government asserts that the district court erred in granting defendants' motion for acquittal. In United States v. Overmyer, we discussed our standard of review pertaining to Rule 29 motions for acquittal:
 
 
 75
 It is well settled that the test to be applied by a trial court in determining a defendant's motion for acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure is taking the evidence and inferences most favorably to the government, if there is such evidence therefrom to conclude that a reasonable mind might fairly find guilt beyond a reasonable doubt, the issue is for the jury. The Supreme Court has observed that the granting of a motion of acquittal, "... will be confined to cases where the prosecution's failure is clear."
 
 
 76
 An appellate court, in reviewing a trial court's decision regarding a Rule 29 motion, applies the same principles to the record it has before it. Other circuits have indicated the use of the same test following the trial court's reversal of a guilty verdict pursuant to Rule 29(c).
 
 
 77
 The 11th Circuit [has] stated the test for review of a verdict overturned by a judgment of acquittal as follows:
 
 
 78
 On a motion for judgment of acquittal, the court must view the evidence in the light most favorable to the verdict and, under that light, determine whether the evidence is sufficient to support the verdict. Thus, on this motion, the court assumes the truth of the evidence offered by the prosecution.
 
 
 79
 867 F.2d 937, 938-39 (6th Cir.) (citations omitted), cert. denied, 493 U.S. 813 (1989).[19]
 
 
 80
 Consistent with the requirement that we view the evidence in the light most favorable to the verdict, we hold that the facts of this case warrant reversal of the district court's decision. In reaching this conclusion, we are mindful of our standard of review. We do not approach this case as would the initial fact-finder; instead, our analysis must begin with the decision of the jury. If that decision is one which reasonably could have been reached, our task is complete; what this court would have determined or what the district court did, in fact, determine would thus be reduced to an irrelevancy.
 
 
 81
 The government produced circumstantial evidence from which the jury was asked to draw numerous inferences. That the evidence was exclusively circumstantial is not fatal to the government's position so long as the evidence does not require too great a "leap of faith in order to support a conviction." United States v. White, 932 F.2d 588, 590 (6th Cir.1991). See also United States v. Stone, 748 F.2d 361, 362-63 (6th Cir.1984) ("[C]ircumstantial evidence alone can sustain a guilty verdict and ... to do so, circumstantial evidence need not remove every reasonable hypothesis except that of guilt."). Here, the government contends that sufficient evidence supports a jury verdict in its favor, the most "damning" of which is perhaps defendants' concealment of chemicals and supplies behind a sheet of plywood in Riggins's attic. After all, "[h]iding, disguising, repackaging, or otherwise concealing supplies is evidence of guilt." See United States v. Wagner, 884 F.2d 1090 (8th Cir.1989), cert. denied, 494 U.S. 1088 (1990)).
 
 
 82
 Other pieces of evidence that, according to the government, support defendants' convictions are as follows: (1) that defendants collected nearly all of the chemicals essential to the manufacture of MDA, see, e.g., United States v. Packer, 730 F.2d 1151 (8th Cir.1984); (2) that defendants purchased certain chemicals in amounts inconsistent with personal use, see, e.g., United States v. Monroe, 866 F.2d 1357 (11th Cir.1989); (3) that defendants purchased expensive equipment capable of being utilized in the drug manufacturing process, see, e.g., United States v. Johnson, 767 F.2d 673 (10th Cir.1985); (4) that Riggins used cash, as opposed to checks, for company transactions, see, e.g., id.; (5) that Riggins could presumably have gotten isosafrole at a better price from distributors nearer to his "business" than Eastman, see, e.g., United States v. Fooladi, 703 F.2d 180 (5th Cir.1983); (6) that Riggins purchased chemicals from more than one supplier, see, e.g., Packer, 730 F.2d 1151; (7) that scant evidence existed suggesting that Logan Ag Lab & Supply was, in fact, a legitimate business, see, e.g., United States v. Settegast, 755 F.2d 1117 (5th Cir.1985); (8) that delivery of chemicals was made to a nonbusiness, residential location, see, e.g., United States v. Williams, 603 F.2d 1168 (5th Cir.1979), cert. denied, 444 U.S. 1024 (1980); (9) that Hapeman, Eastman's representative, had, himself, become suspicious, see, e.g., United States v. Hare, 772 F.2d 139, 142 (5th Cir.1985); (10) that DEA agents detected the odor of ether upon entering Riggins's residence, see, e.g., United States v. Mueller, 902 F.2d 336 (5th Cir.1990); (11) that a fully-loaded revolver was recovered from McVean's bedroom, see, e.g., United States v. Sullivan, 919 F.2d 1403 (10th Cir.1990); and (12) that the book entitled "Drug Manufacturing for Fun and Profit" was found on Riggins's premises, see, e.g., United States v. Green, 548 F.2d 1261 (6th Cir.1977).[20]
 
 
 83
 Counterbalanced against these facts, defendants contend, are those acknowledged by the district court during defendants' sentencing hearing, including the absence of an MDA recipe, any trace of the substance itself, and a few devices essential to the manufacturing process. Moreover, as defendants assert: "The critical items missing in this case are any advance surveillance to suggest that there were any conversations or statements made by Riggins or McVean suggesting that they intended to manufacture MDA or any other illegal drug."
 
 
 84
 Notwithstanding defendants' assertions, we feel that the facts of the instant case do not justify the granting of a Rule 29 motion. Although the evidence relied upon by defendants undoubtedly has some exculpatory value, the question remains whether a reasonable juror must find that such evidence creates a reasonable doubt as to defendants' guilt. Given the dearth of evidence substantiating defendants' claim that they were engaged in a legitimate business enterprise, coupled with the chemicals and related paraphernalia found on Riggins's premises, we conclude that a reasonable juror could come to the same conclusion previously reached by the actual jury here.[21]
 
 III.
 
 85
 Finally, McVean argues that--irrespective of the government's case against Riggins--the evidence against him is insufficient to justify convictions for Counts 1, 2, and 5. McVean claims that "there was no evidence presented from which a jury could infer either that [he] had knowledge of the conspiracy and with that knowledge voluntar[ily] joined the conspiracy or had the specific intent to violate the statute."
 
 
 86
 McVean's argument, however, is without merit. While the evidence may have established that McVean was not the chief conspirator, it did clearly prove that he was a co-conspirator. McVean was occupying the residence in which the DEA agents found most of the incriminating material. In addition, he was in possession of the revolver found in one of the bedrooms. Furthermore, McVean made several comments suggesting his knowledge of the illegitimate nature of his association with Riggins. On one occasion, as noted above, he exclaimed, "oh, shit," when agents discovered the stash that had been concealed in the attic. And as McVean was being transported to the local jail after his arrest, Agent Tennant testified that McVean remarked "if he had known that he was going to jail he would have jumped out the back window, swam his ass up that creek and [the authorities] would have never seen him again." (App. 140.)
 
 
 87
 In short, the jury had before it enough evidence from which to infer McVean's knowledge of and participation in a conspiracy to commit certain federal drug offenses.
 
 
 88
 Accordingly, the decision of the district court granting defendants' motion for a judgment of acquittal on Counts 1, 2, and 5 is REVERSED, and this case is REMANDED for further sentencing proceedings consistent with this opinion.
 
 
 
 *
 The Honorable James P. Churchill, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Isosafrole does have some legitimate uses. It can be used, for example, as part of the manufacturing process for flavorings or fragrances
 
 
 [2]
 According to Riggins and McVean, Gamble was not a Logan Ag employee, but rather, a farmhand who had no connection to the company
 
 
 [3]
 Citing the testimony of Odest Washington, Riggins and McVean dispute the contention that the hanger smelled of acetic anhydride. Washington testified that, since the hanger was ventilated and the chemicals were in a sealed condition, it would have been difficult for the smell of the substance to have permeated the hanger
 
 
 [4]
 Upon seeing the agents, McVean is alleged to have asked Riggins: "[B]oss, boss, what do you want me to do." (App. 236.) Riggins responded: "[J]ust ... shut up." (Id.)
 
 
 [5]
 Ether is "a solvent commonly used in chemical synthesis including the manufacture of illegal drugs." Again, Riggins and McVean claim that the agents were tricked by their senses. If ether, a highly explosive solvent, had been present in the air, they maintain, McVean would not have lit a cigarette while in the residence. Riggins and McVean also note that the agents reported no side effects (e.g., nausea, headaches) commonly associated with the inhalation of ether
 
 
 [6]
 There is some dispute as to whether this substance was actually recovered. Riggins and McVean contend that the can that allegedly contained the acetone may have been empty
 
 
 [7]
 This substance is a reducing agent for illicit drugs and can be used in the manufacture of MDA
 
 
 [8]
 This powder is "mainly used in cutting [and thereby increasing the volume of] cocaine, methamphetamine, or other drugs." (App. 104.)
 
 
 [9]
 These capsules provide one way of packaging MDA
 
 
 [10]
 Subsequently, as he was being transported to the Jefferson County Jail, McVean told Tennant that "if he had known he was going to jail he would have jumped out the back window, swam his ass up that creek and I would never have seen him again." (App. 240.)
 
 
 [11]
 A government witness would later estimate the total value of the paraphernalia--the best equipment available for making MDA--at approximately $20,000
 
 
 [12]
 The 100 ml. figure is probably an error. The correct designation is 1,000 ml
 
 
 [13]
 In United States v. Lee, this court noted:
 [T]o sustain a conviction [for conspiracy] under 21 U.S.C. Sec. 846, the government is required to prove the existence of an agreement to violate the drug laws and that each conspirator knew of, intended to join, and participated in the conspiracy.
 "The existence of a criminal conspiracy need not be proved by direct evidence, a common plan may be inferred from circumstantial evidence." Circumstantial evidence standing alone can sustain the jury's verdict, and such circumstantial evidence need not remove every reasonable possibility except that of guilt.
 Moreover, once the existence of a conspiracy has been proven, only slight evidence is necessary to implicate a defendant. Further, proof of a formal agreement among the conspirators is unnecessary; a tacit or mutual understanding among the parties is sufficient to show a conspiracy. In addition, "[e]very member of the conspiracy need not be an active participant in every phase of the conspiracy, so long as he is a party to the general conspiratorial agreement."
 991 F.2d 343, 348 (6th Cir.1993) (citations omitted).
 
 
 [14]
 The two requisite elements of an attempt are (1) an intent to engage in criminal conduct and (2) the performance of one or more overt acts which constitute a substantial step towards the commission of the substantive offense." United States v. Williams, 704 F.2d 315, 321 (6th Cir.) (citations omitted), cert. denied, 464 U.S. 991 (1983)
 
 
 [15]
 This provision states:
 (a) Unlawful acts
 It shall be unlawful for any person knowingly or intentionally--
 ....
 (6) to possess any three-neck round-bottom flask, tableting machine, encapsulating machine, gelatin capsule, or equipment specially designed or modified to manufacture a controlled substance, with intent to manufacture a controlled substance except as authorized by this subchapter[.]
 
 
 [16]
 Both Riggins and McVean had prior felony convictions to their credit. In fact, they met each other while they were serving prison time for their respective convictions. Their relationship would continue after they were released. The two even discussed pursuing a business venture together (the buying and selling of red oak). Eventually, McVean moved from Florida to Kentucky for the ostensible purpose of helping Riggins in the vegetable business
 
 
 [17]
 Count 3 had been dismissed by the court prior to consideration by the jury
 
 
 [18]
 The district court did not disturb McVean's conviction under Count 4, for which he received a 21-month prison term
 
 
 [19]
 The parties disagree as to the relationship of two Sixth Circuit cases, both of which speak to the applicable burden of proof. In the first case (relied upon by defendants), United States v. Leon, 534 F.2d 667, 677 (6th Cir.1976), the court stated: "Where the evidence as to an element of a crime is equally consistent with a theory of innocence as with a theory of guilt, that evidence necessarily fails to establish guilt beyond a reasonable doubt." As the government properly points out, however, we rejected this proposition in the later case of United States v. Stone, 748 F.2d 361, 362 (6th Cir.1984). In Stone, we stated: "[C]ircumstantial evidence alone can sustain a guilty verdict and that to do so, circumstantial evidence need not remove every reasonable hypothesis except that of guilt." See also id. at 363 ("It is not necessary that circumstantial evidence remove every reasonable hypothesis except that of guilt. To the extent that our previous decisions have indicated our approval of a contrary rule, they are rejected and overruled."). Our holding in Stone is consistent with the Supreme Court's rulings on the matter. See, e.g., Holland v. United States, 348 U.S. 121, 139-40 (1954)
 
 
 [20]
 Defendants argue that the cases relied upon by the government are inapposite because, for the most part, they deal only with determinations of "probable cause for a search and not sufficiency of the evidence beyond a reasonable doubt." (Appellee's Brief at 26.) Defendants' argument, however, is misguided, for the government cites the cases only to support the various inferences the jury apparently drew in analyzing the evidence before it. In the government's words:
 It makes no difference whether, in the particular case, the ultimate issue was probable cause or proof beyond a reasonable doubt. Riggins and McVean cannot credibly argue that the evidence may support a particular inference for probable cause and at the same time [argue] that it would be impermissible for the jury to draw the same inference from the same evidence. The point, again, is that the evidence cited can support the inference the United States advocates.
 
 
 [21]
 In reaching our decision, we offer no opinion as to whether one single fact, standing alone, would be sufficient to sustain defendants' convictions; instead, our decision is based on an evaluation of the facts in their entirety